# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| **TAQUILA MONROE,** | |
| **Plaintiff,** | |
| v. | **Civil Action File No:** |
| **FORT VALLEY STATE UNIVERSITY,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## COMPLAINT

Plaintiff Taquila Monroe ("Monroe" or "Plaintiff") brings this action for relief and damages against Defendant Fort Valley State University, ("FVSU" or "Defendant") based on the following:

## NATURE OF THE ACTION

1. This action arises under the retaliation provision of the Federal False Claims Act, 31 U.S.C.A. §3730(h)(1) ("False Claims Act" or "FCA"). Defendant retaliated against Plaintiff by terminating her employment because she was actively

1

engaging in efforts to stop Defendant's violations of the False Claims Act, which included but were not limited to Defendant's impermissible expenditures and false certifications of compliance with statutory, regulatory and contractual Head Start/Early Head Start grant requirements. Defendant, a public employer, also violated the Georgia Whistleblower Protection Act, O.C.G.A. §45-1-4(d) by terminating Plaintiff, a public employee, in retaliation for her disclosing, objecting to, or refusing to participate in Defendant's ongoing pattern of non-compliance with regulations, rules and laws governing the Head Start/Early Head Start grant, which is partly supported by matching funds from the State of Georgia. In this action under federal and state law, Plaintiff seeks back pay, front pay, lost benefits and renumeration, liquidated damages, compensatory damages, and her attorneys' fees and costs of litigation.

## THE PARTIES

2. Monroe is a citizen of the United States. Monroe was employed by FVSU at all relevant times.

3. Fort Valley State University is an institution of higher learning located in Peach County, Georgia, in this district and division. FVSU is an employer who

receives federal funds as defined by the False Claims Act, 31 U.S.C.A. § 3729 *et. seq.* FVSU, which is a member of the University System of Georgia governed by the Georgia Board of Regents, is a public employer as defined by the Georgia Whistleblower Protection Act.

## SUBJECT MATTER JURISDICTION AND VENUE

4. Jurisdiction of this court is invoked pursuant to 28 U.S.C.A. §1331 and 28 U.S.C.A. §1367(a), which permits this Court to exercise supplemental jurisdiction over state law claims related to the claim in this action.

5. Venue is proper in this district and division under 28 U.S.C.A. §1391 as Defendant resides in, and the alleged unlawful acts occurred in, this district and division.

## PERSONAL JURISDICTION

6. Defendant may be served with proper process concerning this civil action through its Chief Executive Officer, Paul A. Jones, at 1005 State University Drive, Fort Valley State University, Fort Valley GA, 31030.

## FACTUAL ALLEGATIONS

7. FVSU is a public land grant college located in central Georgia, serving over 2500 students.

8. FVSU receives $8.5 to $10 million in grant money annually from the U.S. Department of Health and Human Services to administer the delivery of Head Start services in eight central Georgia counties. FVSU maintains a department, staffed by University personnel, to deliver Head Start services to each county.

9. Head Start ("HS) consists of two components: services for children from low-income families between ages 3 and 5, and Early Head Start ("EHS"), which covers children up to age 3. Both programs play a vital role in improving the educational and life prospects of economically vulnerable children. HS and EHS have won bipartisan praise for their holistic mission that includes early education, nutrition, medical screenings, teaching of literacy and motors skills, and physical development. When run properly, HS and EHS are instrumental in addressing poverty and social inequity.

10. FVSU's grant is structured in this manner: the university delivers resources and services for a network of partner providers, known as subrecipients,

who offer HS and early HS programs in their respective communities. FVSU is mandated by the grant to monitor subrecipient compliance with federal program standards for HS based programs. In addition, FVSU operates its own EHS facility, the FVSU Child Development Center, on campus grounds.

11. FVSU's HS/EHS grant is renewed on an annual basis. As part of the application process, FVSU must enter a program participation agreement certifying its compliance with the statutory, regulatory, and contractual requirements of the grant. FVSU also submits periodic reports of costs and expenditures, as well as documentation of subrecipients' activities and enrollment.

12. Taquila Monroe was hired in August 2020 to serve as the Program Director for FVSU's HS/EHS department. This is a senior leadership role that reports directly to the Executive Director. Monroe's duties included daily program administration, supervision of compliance with federal guidelines and standards, and oversight of sub-recipients and vendors.

13. Monroe brought a wealth of experience to the Program Director's job. For fifteen years, Monroe has worked as a non-profit executive or consultant with a specialty in HS. Prior to taking this job, Monroe has directed or exercised major

operational responsibilities at HS programs in Mississippi, Maryland, Florida, Arkansas, and Alabama.

14. Dr. Francine Hollis, the Executive Director of FVSU HS/EHS, initially tasked Monroe with aligning the program's operations with best practices in the field. Monroe quickly discovered pervasive, systematic problems in the structure of FVSU HS/EHS, issues that could directly imperil the success of the grant as well as its renewal by federal authorities. Monroe sought to implement reforms to save the grant but was consistently rebuffed by her Executive Director, Dr. Hollis.

## **Impermissible Spending**

15. Under 42 U.S.C.A. § 9839(b), federal guidelines mandate that with exceptions not applicable here, the costs of "developing and administering" a Head Start grant shall not exceed 15 percent of the total costs of the program. Monroe discovered that FVSU had exceeded in the past and was on pace to exceed the 15 percent threshold. Monroe learned that the primary cause was an inflated and redundant number of personnel.

16. To bring FVSU under the 15 percent threshold, Monroe submitted a proposal to eliminate positions and redefine certain job descriptions. Monroe's plan

was rejected and FVSU took no other measures to eliminate its excessive use of funds for administrative overhead purposes.

17. It is a fundamental grant accounting principle that government grantees may not allocate funds for purposes unrelated to the program.

18. Monroe learned that HS/EHS grant revenue contributed 45%-50% of the annual compensation for a budget analyst whose stated function was to provide fiscal and accounting analysis to both the HS/EHS program and the university. These shared employee arrangements are legitimate as long as the allocation of costs between the beneficiaries is honest and accurate. Monroe soon discovered that in fact, this budget analyst was almost exclusively focused on university projects unrelated to HS or EHS and that her contributions to the grant's missions were minimal in terms of time and value.

19. Monroe submitted a reallocation of costs in which FVSU would cover 10% of the budget analyst's salary. Monroe's proposal was rejected.

20. Another recognized rule of grant accounting is that current year receipts may not be used to pay debts incurred in a previous year. This rule is aimed at encouraging prudent management of budgets and timely payment of invoices.

21. Monroe observed FVSU allocate current year funding to outstanding prior year invoices that had not been timely paid. Monroe reported this infraction to Dr. Hollis, who took no steps to take corrective action.

22. Monroe found another violation of the rules on grant expenditures. FVSU's fiscal year ends at an earlier time than the fiscal years for the HS and EHS components of the grant. FVSU freezes university expenditures at the conclusion of its fiscal years but has made it a practice to cover costs incurred by the university during this window with funds from the HS/EHS grant. As a consequence of this impermissible practice, the grant's administrators are told to delay their own purchasing orders, even if the delay is detrimental to HS/EHS operations.

23. After Monroe reported these irregularities, FVSU sought to limit Monroe's knowledge of budgeting and expenditures, despite the broad scope of her role as program director.

### Conflicts of Interest Regarding Grant Administration

24. FVSU is simultaneously a principal grantee for the HS/EHS program and a subrecipient, as the FVSU Child Development Center is a partner provider in its own right. This dual arrangement is fraught with the potential for conflict of

interest: as a basic example, Monroe was expected to provide oversight of the Child Development Center, which was also run by her Executive Director, Dr. Hollis.

25. FVSU's operations as the source and recipient of funds inflates FVSU's percentage of the indirect cost allocation it derives from operating the grant. FVSU therefore derives a financial benefit from the arrangement, as do any employees of FVSU HS/EHS who draw an additional salary from the Child Development Center. FVSU has been counseled by federal regulators to avoid this dual source/recipient arrangement but has continued it.

**Failure to Comply with Mandatory Program Criteria**

26. Under federal regulations, HS/EHS programs must establish a Policy Council as part of their governance structure. Under Section 642(c)(2)(D) of the Head Start Act Policy Councils, which must be composed of parents and community leaders, are responsible for the program design and operation of the program, as well as long and short term planning goals and objectives.

27. In October 2020, the leadership of the Policy Council was informed that going forward, the Council would not be included in decision making regarding the HS/EHS program and that the Council's participation would be limited to

informational briefings and informal input. FVSU's decision to abrogate the governance responsibilities of the Council is in direct violation of federal law and denies the statutory intent of guaranteeing community stakeholders a meaningful role in shaping Head Start's mission.

28. Monroe advised Dr. Hollis that FVSU's effort to cancel the role of the Policy Council in program governance violated federal law, but Monroe's guidance was ignored.

29. Section 645A(h) of the Head Start Act directs that all teachers employed in the EHS component of the program meet a minimum standard of holding a child development associate credential and have been trained in or received equivalent coursework in early childhood development.

30. In reviewing the performance of FVSU's partner subrecipients, Monroe discovered that a significant portion of their EHS teaching staff did not hold child development associate credentials, as federal law mandates. Monroe raised this noncompliance issue with Dr. Hollis, who failed to take any action to bring FVSU's partners into compliance with the staff credentialing criteria.

31.     45 CFR Part 1302.103 requires Head Start programs to implement a series of upgraded performance standards enacted in 2016, including a review of community assessment data related to the eligible population for enrollment; evaluation of professional development for staff; and development of safeguards for data sharing. Programs are also directed to conform their process for purchase of curriculum and the allocation of staff time with new federal criteria.

32.     Monroe advised Dr. Hollis that FVSU had not implemented the new protocols and that subrecipients consistently failed to match current performance standards. Dr. Hollis responded by admonishing Monroe that she lacked an understanding of FVSU's "culture".

33.     FVSU's obligations under the HS/EHS grant include effective monitoring of subrecipient compliance with enrollment and income eligibility standards.  Monroe identified deficiencies that included failing to adjust enrollment data to reflect exits from the program and as of January 2021, was in the process of installing a more effective monitoring protocol.

## Retaliatory Conduct

34. On January 15, 2021, Monroe was informed that she was being terminated as Program Director. Prior to her firing, Monroe received no negative evaluations, or disciplinary action, and was given no warning that her job was in jeopardy. FVSU's termination essentially acknowledges that Monroe's identification of numerous irregularities and compliance issues was the cause of her abrupt dismissal: as the letter puts it, Monroe's actions as Program Director "were not properly vetted to ensure that the Head Start and Early Head Start programs are continuing to operate within the established FVSU system."

35. The "established FVSU system" is replete with impermissible expenditures and numerous violations of federal regulations and statutes. In fact, as of March 2021, upon information and belief, FVSU has been ordered by federal regulators to undergo a financial audit regarding spending activities related to the HS/EHS grant. Monroe's termination for attempting a course correction is unlawful conduct under the False Claims Act's retaliation provision and the Georgia Whistleblower Protection Act.

## COUNT I

## (**Violation of the Retaliation Provision of the False Claims Act, 31 U.S.CA. §3730(h)**)

36.     Plaintiff incorporates by reference all preceding paragraphs in this compliant.

37.     Plaintiff engaged in protected activity when she identified and reported numerous infractions of federal statutes and regulations related to Head Start and Early Head Start programs.

38.     Defendant falsely certified to the U.S. Department of Health and Human Services in its provider participation agreement related to the Head Start/Early Head Start grant that it would comply with applicable laws and regulations.

39.     Plaintiff engaged in efforts to stop one or more violations of the False Claims Act, 31 U.S.C.A. §3730(h)(1).

40.     Defendant knew that Plaintiff was engaged in efforts to stop one or more violations of the False Claims Act and her termination was caused by her participation in such protected activity.

41. Defendant's retaliatory conduct has inflicted damages on Plaintiff including but not limited to lost backpay, front pay, benefits of employment, liquidated damages, compensatory damages related to mental anguish, emotional distress, costs of litigation and attorneys' fees.

## COUNT II
**(Violation of the Georgia Whistleblower Protection Act, O.C.G.A. §45-1-4)**

42. Plaintiff incorporates by reference all preceding paragraphs in this complaint.

43. Plaintiff was a public employee of a university that is a part of the Georgia University System governed by its Board of Regents.

44. Plaintiff disclosed Defendant's violation of or noncompliance with a law, rule or regulation to a supervisor.

45. Plaintiff objected to activities, policies, and practices of the Defendant that she had reasonable cause to believe were in non-compliance with a law, rule, or regulation.

46. Defendant retaliated against Plaintiff for reporting or for objecting to activities, policies and practices that Plaintiff had reason to believe were in violation of or noncompliance with a law, rule, or regulation.

47. Defendant's retaliatory conduct has inflicted damages on Plaintiff including but not limited to lost wages and benefits of employment, compensatory damages related to mental anguish, emotional distress, costs of litigation and attorneys' fees.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff demands a trial by jury and that the following relief be granted:

- A. Back pay, front pay, and lost benefits, including liquidated damages;
- B. Compensatory damages to the extent allowed by law;
- C. Attorneys' fees and costs of litigation;
- D. Pre-judgment and post-judgment interest at the highest lawful rate; and
- E. Such other equitable and monetary relief as the Court deems just and proper.

Respectfully submitted, the 16th day of March, 2021.

        **HKM Employment Attorneys LLP**

        *s/Jermaine A. Walker*
        Jermaine "Jay" A. Walker
        Artur Davis[1]
        3355 Lenox Rd. NE
        Suite 660
        Atlanta GA 30326
        jwalker@hkm.com
        404-301-4020
        adavis@hkm.com
        404-220-9165

---

[1] Artur Davis will promptly file for admission *pro hac vice* as an attorney of record in this action. Davis is licensed in the state of Alabama and the District of Columbia.